The evidence authorized the verdict declaring the defendant guilty of the offense of murder. The judge did not err in overruling the motion for a new trial, which contained only the general grounds.
Judgment affirmed. All the Justices concur.
 No. 14378. DECEMBER 1, 1942.
W. L. Nunn was convicted of murder, and was sentenced to life imprisonment. His motion for new trial, based on the general grounds only, was overruled, and he excepted.
The undisputed evidence on the trial showed that the defendant shot and killed James Manley on Sunday afternoon, February 22, 1942. The defendant and Manley did not know each other until about two weeks before the killing, when the defendant went to Atlanta and employed Manley to work for him. Manley moved into the defendant's home near Montrose, and lived with the defendant and his family. It appeared from the State's evidence that the relationship between the defendant and the deceased was not pleasant, and on the afternoon of February 22 they terminated their contract of employment. The deceased left the home of the defendant, taking his suitcase with him, and went to a small store or filling-station near by to wait for a bus to Atlanta. While *Page 69 
he was so waiting, the defendant came to him and told him that he had paid him too much money. The deceased denied this, and in the ensuing argument stated that the defendant would not pay his debts, and that a cousin of the defendant had told him so. The defendant told the deceased "he wasn't nothing no way;" that any one who would conduct himself as the deceased had in his house "ain't nothing." The deceased replied, "I am as much as you are, you low down son of a bitch." The defendant told the deceased that he could not call him that, and that he would kill him. The defendant then went to his house, a distance of about seventy-five yards from where the argument had taken place. After he had left, the deceased told a boy who lived in the house with the defendant to go and tell the defendant that if he brought a gun out there he would make him eat it, but the boy did not leave. In about three or four minutes the defendant came back with a double-barreled shotgun and told the two persons with the deceased to move, that he was going to shoot. Nothing was said between the defendant and the deceased, who was unarmed. The defendant stopped about eight feet from where the deceased was standing, and shot him in the left hand. When the deceased raised his hands and started walking toward him, the defendant shot him "in the forks of the breast," inflicting a mortal wound.
The defense introduced testimony that the deceased was taller and heavier than the defendant, and that the defendant had not fully recovered from injuries received in an automobile accident in December. In his statement at the trial he told about going to Atlanta and hiring the deceased, and how the arrangement soon became unsatisfactory to both parties. He stated that the deceased was dissatisfied because the defendant would not consent for him to bring his "girl," who was in the State farm at Milledgeville, to live with them. The defendant decided to let the deceased go, because of the vulgarity of his personal conduct around the house. His statement with reference to the shooting was as follows: "I said, `Mr. Manley, I am sorry I brought you down here,' and he said, `I am sorry that I came.' I said, `I have got your record anyway,' and he said, `It won't ever do you any good,' and he asked me to let him see it, and I wouldn't do it. He said, `Come out to the store,' and I went out there. The worst of it started about him pouring water out the window. He said, `You God damn son *Page 70 
of a bitch, I am just as good as you are,' and I said, `Don't call me that; that is something I am not going to take,' and he said, `You God damn son of a bitch, I am just as good as you are,' and I tried to make him take it back. The house was about thirty steps or something like that from where we were, and I went and got the gun, and my wife's sister's little boy said, `Don't go on him.' I told him to take that back. I thought he had cut the boy. He slung him about ten feet. I shot down that way to scare him, and he said, `You God damn son of a bitch,' and he kept coming on me, and I shot him the last time. I kept begging him to stop, and he wouldn't stop. I had gotten his record."